UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                 Case Number 15-20743
v.                  Honorable David M. Lawson

DUANE LETROY BERRY,

    Defendant.
_____/

## ORDER AUTHORIZING ADMINISTRATION OF MEDICATION

  Defendant Duane Berry was charged with violating the frauds and hoaxes statute, 18 U.S.C. § 1038(a), when he allegedly planted what looked to be a bomb in front of a building housing a Bank of America branch in downtown Detroit, Michigan. The "bomb" turned out to be fake. He has been found incompetent to stand trial, based on a diagnosis of a delusional disorder. The Bureau of Prisons believes that Berry's competence could be restored with antipsychotic medication. Berry refused to take them. The government now seeks an order to medicate Berry forcibly. That motion requires a hearing and evaluation as prescribed by *Sell v. United States*, 539 U.S. 166 (2003), and the government must offer "clear and convincing evidence" on each of four factors, addressed below, to overcome the defendant's liberty interest of avoiding forced medication.

  The Court already addressed the first *Sell* factor, finding that the government established that it has an important interest in continuing the prosecution of the defendant in this case. *See* dkt. #64, at 7. An evidentiary hearing was held on June 1, 2017, and the Court heard testimony from a psychologist and a psychiatrist who evaluated the defendant at FCI Butner in North Carolina. The parties requested leave to file post-hearing briefs, which were received recently. The government

has established by clear and convincing evidence that the defendant's liberty interest must yield to the medication protocol outlined in this order.

I.

As noted in a previous order, Christine Scronce, Ph.D., a psychologist from the Metropolitan Corrections Center in Chicago, Illinois, diagnosed Berry as suffering from a Delusional Disorder, Mixed Type, First Episode, which currently is an acute episode. It appears that this mental illness has come upon the defendant gradually and later in life. Dr. Scronce interviewed Berry's ex-girlfriend, who stated that Berry became increasingly interested in filing lawsuits and complaints after he was released from a previous detention. She said his efforts consumed him, and he became increasingly withdrawn and isolated. However, it was the weeks before his arrest in 2015 on the present case when she noticed a radical change in his behavior. She said he became religiously preoccupied and sent her numerous messages about "end times." She said it was very unlike him to be so religiously preoccupied and she found it odd for him to send her messages "all day long." She also said that Berry stopped coming to visit their son, even though he was usually a very attentive parent. And she was concerned that Berry had not been in touch with her or his father in the months leading up to his arrest. She said that their son wrote Berry a note, to which he did not respond. According to his ex-girlfriend, this was very out of character for Berry, who was usually very close with his son.

After Berry was found incompetent to stand trial and transferred to FCI Butner, he was seen by Dr. Kristina Lloyd, a psychologist, and Dr. Logan Graddy, a psychiatrist, who both testified at the evidentiary hearing about Berry's competency and proposed a treatment plan. Both are qualified mental health professionals.

## A. Dr. Kristina Lloyd

Dr. Lloyd explained that she carries a patient load of around two dozen. Berry is one of her patients. She acknowledged that delusional disorder is somewhat rare and she has had only between six and ten patients with the disorder.

Dr. Lloyd described Berry as very polite and cordial at their first meeting. She said that he interacted appropriately and did not show any signs of a delusional disorder at first. Because Berry did not present any indications that made the FMC Butner staff believe that he needed a higher level of security, he was placed into the open population. A few days later, Dr. Lloyd and her intern conducted a psychosocial assessment. The interview lasted approximately 30 minutes. In this second interview, Berry was able accurately to report some of his background information. However, when it came to job history, his answers were clouded by his delusions. Additionally, the interview was impeded by Berry's insistence that he wanted all of the interviews recorded in light of his Supreme Court case. Dr. Lloyd testified that the interview was complicated further because Berry, unlike other patients, wanted to direct the interview, and he had a list of legal concerns that he wanted to discuss first. After Berry exhausted the matters he wished to discuss, he allowed Dr. Lloyd to obtain the background information she was requesting. Consistent with his prior evaluation, Berry asserted that he worked as a "repo agent" for the IRS and he identified himself as a trustee for the Bridgewater Capital Trust.

In the third meeting with Berry, Dr. Lloyd attempted to begin explaining the plan to restore him to competency. It started by determining if Berry understood the charges against him, evaluating his understanding of court procedures, and identifying strategies to working with his attorney. The interview also included some psychological assessment and an explanation of the

specific skill sets that she would like to see demonstrated in order for him to be found competent. Initial treatment plans at FMC Butner tend to be very general and not tailored to specific patients. Typically, Berry would have been referred to a psychiatrist to determine whether medication was appropriate. Unfortunately, Berry refused to meet with a psychiatrist. In the fourth meeting with Dr. Lloyd, Berry merely stood in the office doorway holding a stack of folders and indicated that it was not appropriate to talk with her because they were "in litigation" and "[i]t is unlawful for [them] to be communicating."

Dr. Lloyd would have liked to perform two types of psychological tests on Berry: a standardized psychological assessment, which measures information about functioning, psychopathology, and level of effort; and a forensic assessment used to determine competency to stand trial. Berry refused to participate.

Dr. Lloyd testified that she was able to conduct only five interviews with Berry. Each one was progressively shorter, with the first lasting approximately 75 minutes, and the final meeting taking place in a hallway for approximately 10 minutes. At that final meeting, Berry said that he could no longer speak with Dr. Lloyd, because he had begun legal proceedings against her and made a demand of $1,000,000. He refused to interact with her from that point forward. Dr. Lloyd was unable to conduct the extensive psychological testing that she would normally perform on a patient or observe Berry in a group restoration setting.

Although Berry's participation limited the potential to restore his competency to stand trial, Dr. Lloyd was still able to confirm the diagnosis of delusional disorder. She based her diagnosis on her brief interviews with Berry, his legal filings, the prior diagnosis by Dr. Scronce, his medical records, interviews with counsel in this case and the FMC Butner staff, and materials provided by

Berry. She concluded that Berry's competency has not been restored and he is not competent to stand trial at this time.

Dr. Lloyd believes that medication, forced or otherwise, would benefit Berry. She said that medication is the first line of treatment for individuals with delusional disorders. In her experience, individuals who are treated with antipsychotic medication are more likely to be restored to competency than those who are not treated. In 2009, when she was an intern at FMC Butner, she was part of a study that considered whether forced medication works. The study reviewed all reports from every medical center in the Bureau of Prisons and analyzed the data to determine whether involuntary medication was effective for competency restoration purposes. From 2003 to 2009, forensic evaluators had requested judicial oversight under *Sell* 287 times. Of those, 133 patients were forcibly medicated. Included in that group of 133 patients were 15 cases of patients with delusional disorders. Of the 15 patients with delusional disorders, 11 were restored to competency (approximately 73%). Dr. Lloyd also noted that another study had been completed in 2007 by Drs. Herbel and Stelmach specifically looking at delusional disorder. In that study, 22 patients suffering from delusional disorder were force-treated; 17 were restored to competency. The average time for a person with delusional disorder to be restored to competency through forced medication was about 144 days. The shortest was 30 days and some took up to a year.

Dr. Lloyd testified that the decisions about medication are left to the psychiatrists; she was hesitant to testify about medications. Nonetheless, she described the possible side effects of antipsychotic medications as generally minor, and they can be treated adequately on a case-by-case basis. Haldol, one of the proposed medications in this case, has a wide range of possible side effects, including an appearance of sedation or restlessness, weight gain, diabetes, high cholesterol,

neuroleptic malignant syndrome (a potentially life-threatening effect), dystonic reaction (a painful involuntary contracting of the muscles), Parkinson's syndrome-like symptoms, and even sudden death.

But Dr. Lloyd said that there are no alternatives to medication that effectively would restore Berry to competency. No studies show that traditional methods of psychotherapy, cognitive behavioral therapy, or any of the empirically-based therapeutic approaches are effective in treating delusional disorder without adjunct medical therapy. Furthermore, Berry remains preoccupied with his delusions even if the topics introduced to him have no relationship to his delusions. Dr. Lloyd said that talking with him is ineffective. Therefore, she surmised, if she were to confront Berry with evidence that he does not work for the government, he would likely argue against that evidence or, as he has done in the past, terminate the conversation. In her experience, she is not aware of anyone with delusional disorder being restored to competency without medication.

According to Dr. Lloyd, there is no cure for delusional disorder, but it can be effectively treated through medication. She said it is not impossible for Berry's delusional disorder to go into remission without medication, but she said that is unlikely in this case, mainly because Berry's delusions are tied to his legal problems. An ongoing stressor, such as this case, increases psychosis, and while his legal issues persist, it is unlikely that his delusions will subside. She also testified that even if this case were to resolve and Berry were released, the likelihood that his delusions would go into remission is decreased only slightly because it appears that his preoccupation with the courts predates this case.

## B. Dr. Logan Graddy

Dr. Graddy supervises three psychologists at FMC Butner, including Dr. Lloyd, for whom he provides consultation and hands-on patient services. Those tasks proved difficult in this case, however, because Berry refused to meet with him. When Berry would not go to Dr. Graddy, he went to Berry's cell door and introduced himself. Berry said that he did not want to speak with him and did not want to be evaluated by a psychiatrist. There were no follow up meetings. When formulating a treatment plan, typically Dr. Graddy would discuss medications with a patient and the specific issues related to each medication. However, because Dr. Graddy was unable to meet with Berry, this type of collaborative process did not occur.

Dr. Graddy generally chooses the appropriate anti-psychotic medication from the Bureau of Prisons's formulary of medications. Other medications are also available, but require approval by a pharmacist. Dr. Graddy tends to rely on the formulary medications because they are a good representation of a particular class of medications.

Although Dr. Graddy wrote in his report that "with reasonable medical certainty, involuntary medications are substantially likely to render Mr. Berry competent to stand trial," his hearing testimony was more equivocal. He testified that before coming to FMC Butner, he was pessimistic that antipsychotic medications were effective at treating delusional disorders. He said that most psychiatrists are very pessimistic about patients with delusional disorders because they tend to see them for very short periods of time and they tend not to improve. However, after working at FMC Butner for some time, he says he is now "cautiously optimistic" about the efficacy of medications to treat delusional disorders. His information on restoration through antipsychotic medications comes more from reviewing research papers and discussions with colleagues than from his own

experiences. As Dr. Lloyd noted, it is difficult to research people with delusional disorder because they do not regularly seek help and often cease treatment once they are confronted with evidence that their delusions may be unfounded. Furthermore, he explained, the number of studies is limited not only because the condition is rare, but because drug companies, who conduct a great number of studies, do not have an incentive to study delusional disorders specifically.

Dr. Graddy believes that, from a humanitarian standpoint, "it would be good for [Berry] to receive treatment." Nonetheless, when Dr. Graddy was asked to quantify the likelihood that Berry could be restored to competency through medication, he answered more cautiously, saying that to the degree that Berry is similar to previously studied populations, he is "substantially likely to respond to medication."

Dr. Graddy testified that there are a number of side effects that are associated with Haldol and some of the other medications available. Haldol's main side effect is neuromuscular; it may cause tremors, stiffness, and in some cases permanent tremors of the face, hands, or legs. He said that those types of side effects are fairly common and the intensity can vary. The effects can be mitigated through conjunctive medications, however. Other side effects can be quite serious and include death, but such occurrences are quite rare, as few as one in 10,000 cases. Newer medications, according to Dr. Graddy, such as Risperidone or Zyprexa, cause less neuromuscular problems, but have other side effects such as weight gain and diabetes, which can be lessened in a number of ways. Dr. Graddy testified that the medications have similar benefits, but each one has its own drawbacks. Dr. Graddy finds it unlikely that Berry will voluntarily take either Risperidone or Zyprexa, so he is working on the assumption that Haldol injections will be necessary.

Dr. Graddy testified that he would not prescribe medication without interviewing a patient, knowing their history of treatment, and meeting with the person. Berry was not offered medication because he refused to continue discussions with the treating staff at FMC Butner. In a situation like this one, Dr. Graddy said that he would wait for a Court order before prescribing medication.

* * * * * * * * *

No other witnesses testified at the hearing.

## II.

As discussed in an earlier order entered in this case, an individual has a "significant" constitutionally protected "liberty interest" in "avoiding the unwanted administration of antipsychotic drugs." *Washington v. Harper*, 494 U.S. 210, 221 (1990). There are times, as here, when the government seeks to trench upon the liberty of an individual who refuses competence-restoring medication. To do so, however, the government must establish that it has "an 'essential' or 'overriding' state interest" in forcibly medicating a criminal defendant to restore his competency to stand trial. *Sell v. United States*, 539 U.S. at 179. The decision to force antipsychotic medication upon an unwilling defendant is not one to be taken lightly. As one court observed, involuntary medication orders "are a tool that must not be casually deployed, for forced medication is a serious intrusion upon the integrity of the individual and the effects of such medication upon body and mind are often difficult to foresee." *United States v. Chatmon*, 718 F.3d 369, 374 (4th Cir. 2013).

To justify forced medication, the government must offer "clear and convincing evidence" on four factors: "(1) the existence of an 'important' governmental interest; (2) that involuntary medication will 'significantly further' the government interest; (3) that involuntary medication is 'necessary' to further those interests; and (4) that administration of the drugs must be 'medically

appropriate' for the individual defendant." *United States v. Green,* 532 F.3d 538, 545 (6th Cir. 2008) (quoting *Sell*, 539 U.S. at 180-81); *see also United States v. Mikulich*, 732 F.3d 692, 696 (6th Cir. 2013).

A.

As noted above, the Court already has found that the government has satisfied the first factor. Berry argues in his supplemental brief that the government's interest in continuing the prosecution against him is not so important. But he has not offered new evidence or arguments that would undermine the Court's prior ruling.

B.

The government also has shown that forced medication will further its "important interest." The case law suggests two factors for determining the "significantly further" element of the *Sell* test: *first*, that the "'administration of the drugs is substantially likely to render the defendant competent to stand trial'"; and *second*, that "'administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.'" *Green*, 532 F.3d at 552 (quoting *Sell*, 539 U.S. at 181).

On the first point, Berry argues that the data are limited on his personal history and delusional disorders in general. He contends that the studies Dr. Lloyd relied upon involve very small samples of defendants with delusional disorders in the Bureau of Prisons, and they are insufficient to show that there is a substantial likelihood that Berry will be restored to competency with medication. The Court disagrees. The statistical data show that medication is likely to treat delusional disorders effectively. The government need not establish this point to "a certainty"; a

"substantial probability" will suffice. *United States v. Payne*, 539 F.3d 505, 509-10 (6th Cir. 2008). The government has cleared that bar through the testimony at the hearing. What's more, though, is that without medication, there is virtually no chance that Berry's delusions can be controlled.

Courts that have quantified the chances of successful restoration of competency have found 70 percent sufficient, *United States v. Gomes*, 387 F.3d 157, 161-62 (2d Cir. 2004), but 10 percent was not sufficient, *United States v. Ghane*, 392 F.3d 317, 319-20 (8th Cir. 2004). In *Green*, the physicians pegged the likelihood of restoration at 90 percent. *Green*, 532 F.3d at 553. The overlapping studies Dr. Graddy relied upon show a greater than 70% chance of competency restoration, although those studies were based on a very small pool of patients. Dr. Graddy himself characterized his optimism that Berry would be restored as "cautious." Nonetheless, he stated that without medication, the likelihood of restoration was nil.

Balancing that against the second point, the potential side effects caused by Haldol (the drug of choice) or the alternatives, run the gamut of mild to severe, with the milder effects more likely and the severe ones exceedingly remote. But it is considerably unlikely that they would interfere with Berry's ability to assist defense counsel at trial. Dr. Graddy testified that the more common neuromuscular side effects can be controlled by adjunct medication and would not impact Berry's ability to assist counsel. The administration of Haldol "is substantially unlikely to have side effects that will interfere significantly with [Berry's] ability to assist counsel in conducting a trial defense." *Green*, 532 F.3d at 552.

The second factor favors the government's position.

C.

Berry argues that involuntary medication is not necessary to further the government's interests. He notes that there is no history that he has been diagnosed or received treatment previously, and he notes that Dr. Lloyd testified that medication is not the only form of treatment. But that does not characterize the testimony accurately. Both Dr. Lloyd and Dr. Graddy testified that delusional disorders do not improve without medication. Dr. Lloyd explained that although delusional disorders wax and wane and are exacerbated by stressors, Berry's condition is not likely to go into remission on its own. She concedes that delusional order cannot be cured, but she was adamant that the symptoms can be treated medically, and a person can be restored to competency through treatment. There is no other evidence in the record on that point.

In assessing whether the involuntary medication is necessary, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181. That finding is manifest on the present record with respect to therapeutic alternatives. The Supreme Court also has suggested that district courts consider alternatives such as "a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Ibid*. Other courts have explained that this directive "is not tantamount to a requirement that a defendant must be first held in contempt in each and every case. This option would, however, allow the defendant to decline at least for a period of time forcible medication, albeit at the cost of confinement or some other civil sanction." *United States v. Chatmon*, 718 F.3d 369, 375-76 (4th Cir. 2013) (remanding the case to the district court to consider whether ordering the defendant to take the prescribed medication with the backing of civil contempt and other less restrictive means would restore competency). That option here likely would be a hollow formality, since Berry has

refused even to talk to Dr. Graddy, and he already is in custody. Nonetheless, the Court will account for that less-intrusive option in formulating its order, below.

The government has shown by clear and convincing evidence that medication is necessary to further its interests.

D.

The fourth *Sell* factor requires a finding that "'administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition.'" *Green*, 532 F.3d at 555 (quoting *Sell*, 539 U.S. at 182). Berry argues that the government has failed in proving this element of the *Sell* test because there are no specific guidelines in the Bureau of Prisons prescribing the medications that should be used. However, Dr. Graddy specified Haldol as the appropriate medication, although Risperidone or Zyprexa are viable alternatives, and he described a plan in place to treat Berry appropriately. He said that treatment would begin with a period of time explaining the process to Berry, inviting him to take the medication voluntarily, and soliciting his input on his preferred medication of the ones mentioned. The first treatment would be the smallest dosage possible and, absent a severe reaction, the levels would be adjusted for optimum effectiveness.

That evidence satisfies the fourth *Sell* factor. Courts have observed that "[d]ifferent kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.'" *Green*, 532 F.3d at 555 (quoting *Sell*, 539 U.S. at 182). *Sell* orders directing involuntary medication of a defendant must be "based on individualized treatment plans that identify which drugs will potentially be administered to a defendant and their dosage range." *United States v. Chavez*, 734 F.3d 1247, 1253 (10th Cir. 2013). Dr. Graddy has taken that into account. The government has

shown that treatment of Berry's delusional disorder with the class of drugs described at the hearing is medically appropriate.

III.

Appellate courts have roughly defined a sweet spot for orders authorizing forced medication to restore a defendant to competency. Blanket authorizations are not valid. *See United States v. Evans*, 404 F.3d 227 (4th Cir. 2005) (vacating the district court's order of involuntary medication because the government did not relate the proposed treatment plant to the individual defendant's particular conditions). Nor, however, are orders that are punctiliously specific, as "[a] district court is not in the position, and does not possess the requisite knowledge to dictate a precise course of medical action for any defendant." *Green*, 532 F.3d at 557. The Ninth Circuit has suggested that

> [a]t a minimum, to pass muster under *Sell*, the district court's order must identify: (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress. We stress that while the court may not simply delegate unrestricted authority to physicians, the restrictions it does impose should be broad enough to give physicians a reasonable degree of flexibility in responding to changes in the defendant's condition.

*United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008). In *Green*, the Sixth Circuit noted that the district court's order would satisfy the Ninth Circuit's criteria. *Green*, 532 F.3d at 557. The main criterion is that the order authorizes "that physicians exercise their medical judgment and make decisions in accordance with prevailing medical standards, all while taking into account the particular needs and decisions of the individual patient." *Id.* at 557-58.

Accordingly, it is **ORDERED** that the government's request to administer medication to the defendant is **GRANTED** under the following conditions:

A	Mental health professionals at FCI Butner are authorized to devise a plan of treatment for defendant Duane Berry's delusional disorder that includes medical therapy and psychotherapy;

B.	The treatment regimen must begin with an attempt by a psychiatrist to consul with Mr. Berry to discuss medications and the specific issues related to each medication as part of devising a treatment plan;

C.	Mr. Berry must be given the opportunity to agree with a treatment plan within the range of options made available to him, including the mode of administration of medications;

D.	If Mr. Berry refuses medical treatment, the assigned BOP psychiatrist may administer medication forcibly;

E.	The medications that BOP psychiatrists at FCI Butner may administer are limited to Haldol, Risperidone, and Zyprexa;

F.	The medication must be administered at first in the smallest dose that is appropriate to achieve an effective therapeutic level, and the BOP medical staff at FCI Butner must monitor Mr. Berry and adjust dosages as necessary and appropriate for optimum effectiveness;

G.	BOP psychiatrists at FCI Butner are authorized to administer conjunctive medications to mitigate any side effects of the primary medication, as appropriate; and

H.	The treatment may continue for four months, or a lesser period if reasonably sufficient to restore Mr. Berry to competency; at the end of four months, or earlier if the defendant's competency is restored, the BOP must file a report with the Court describing the results of the treatment.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 31, 2017

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 31, 2017.

        s/Susan Pinkowski
        SUSAN PINKOWSKI